UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE FOOD CLUB CORP., and EDUARDO REBOLLO,<br><br>                    Plaintiffs,<br><br>      v.<br><br>KUEHNE + NAGEL, INC.<br><br>                  Defendant. | Civil Action No.:<br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

Plaintiffs, The Food Club Corp., ("Food Club") and Eduardo Rebollo ("Mr. Rebollo"), by their attorneys, complaint and allege against Defendant Kuehne + Nagel, Inc., ("K+N") as follows:

## NATURE OF THE ACTION

1.  Plaintiff Mr. Rebollo is the CEO, owner and operator of Food Club and www.ibericoclub.com. Food Club is in the business of importing food products from abroad, particularly from Spain. Since its inception, Food Club has used K+N, the American subsidiary of a Swiss global shipping and logistics conglomerate, for all of its end-to-end logistics and transportation, including for the handling of all requisite customs and regulatory issues in connection with the importation of Jamon Iberico de Bellota, a specialty Spanish boutique ham product sold to high-end customers throughout the United States.

2.  As a result of errors committed by K+N, errors which were repeated several times over a twenty-one (21) month period, Food Club has had product destroyed by order of the United States Department of Agriculture, Food Safety and Inspection Service and was forced to initiate a nationwide recall of all products.

3.  That recall, involving the delivery of notices to all of Food Club's customers as to every sale made since the beginning of operations, and public notification by federal authorities, has had a devastating effect on Mr. Rebollo's business. Indeed, the business has been ruined.

1

4.  It is only the errors of K+N that rendered the product "illegal" in the eyes of the government by failing to provide the proper chain of custody documents, leading to the recall.

## THE PARTIES

5.  Plaintiff Food Club is a corporation registered under the laws of the State of California, having its principal place of business at 121 Crandon Blvd., Suite 149, Key Biscayne, FL 33149.

6.  Plaintiff Mr. Rebollo is a resident of the State of Florida.

7.  Defendant K+N is a corporation registered under the laws of the State of New York, having its principal place of business at 10 Exchange Place, Jersey City, New Jersey 07302.  K+N is a wholly-owned subsidiary of Kuehne + Nagel International AG, a Swiss corporation with worldwide transportation and logistics operations.

## JURISDICTION AND VENUE

8.  This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332, as the parties are citizens of different states, and the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00).

9.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the Defendant is incorporated in the State of New York, county of New York.

10. K+N has expressly consented to the jurisdiction of the United States District Court for the Southern District of New York for disputes arising out of in connection with the Terms and Conditions of K+N.

11. The Terms and Conditions between Food Club and K+N specifically provides that the "terms and conditions of service and the relationship of the parties shall be construed according to the laws of the State of New York without giving consideration to the principals of conflict of law. Customer and Company (a) irrevocably consent to the jurisdiction of the United States District

Court and the State of New York."   (Attached hereto as Ex. A, ¶ 21).  This Court has personal

jurisdiction over K+N by virtue of the above-referenced facts.

## STATEMENT OF FACTS

12. Mr. Rebollo founded Iberico Club in April 2013, investing his time and resources to bring

a superior, high-end pork product from Spain to the United States.  Mr. Rebollo expended

significant resources on Iberico Club, including not only financial resources, but also his own time

to develop relationships with producers, to generate marketing materials and strategies, to locate

customers in the United States, as well as to insure the lawful manufacture, export and import of

the product and compliance with applicable laws.

13. Jamon Iberico de Bellota, the Spanish ham which Mr. Rebollo imports, is an expensive

specialty product sold to a niche gourmet-food market segment.

14. As one of only a handful of companies with the right to import this product from Spain to

the United States, Iberico Club held a unique place in the market and provided a rare service in the

United States.

15. Food Club is a related distribution firm, also owned by Mr. Rebollo and utilized by Iberico

Club for distribution of one product, Jamon Iberico de Bellota ham.

16. Having worked in the food distribution business for several years, Mr. Rebollo knew that

the importation of food is heavily regulated worldwide, with United States regulations being

particularly complex, and enforcement being particularly strict. For that reason, he sought out an

experienced, well-regarded end-to-end logistics company to deal with all aspects of the United

States import process, including one capable of navigating the customs and regulatory compliance

aspects.  Upon the recommendation of the product manufacturer in Spain, and after extensive

research and investigation into various freight forwarding and customs brokering options, Mr.

Rebollo selected K+N to oversee all aspects of the process.

17. K+N holds itself out as "one of the world's leading logistics providers," with "more than 1,000 offices in over 100 countries, with over 63,000 employees. It touts its founding in 1890 and its growth to become the "Number 1 global seafreight forwarder," the "Number 2 global air cargo forwarder," and the "Number 2 global contract logistics provider."

18. On its website, K+N advertises its expertise and experience in the importation of goods, including perishables:

Transportation and Transport Management

> Kuehne + Nagel's inbound transport management services include the arrangement of shipping, air or land-based transport to move customers' goods from remote destinations to local warehouses or operating facilities. Kuehne + Nagel's inbound transport services include most forwarding and "in-country" freight movements.

Customs Clearance

> With our many years of experience in cross-border trade, Kuehne + Nagel can provide you with all required services to move your goods across international borders. These services include customs document preparation and delivery, management of the actual clearance process, import document preparation, etc.

19. K+N's website states that the company has "many years of experience in cross-border trade" and has the ability to provide "all required services to move your goods across international borders-services such as customs document preparation and delivery, management of the actual clearance process, import document preparation, etc." (*See* http://www.kn-portal.com/contract_logistics/outbound_logistics/ last visited August 20, 2015).

20. In K+N's own words, "[i]ncomplete or wrong customs documentation can cause considerable delays in transportation, reducing supply chain and delivery reliability." (*See* http://www.kn-portal.com/locations/north_america/canada/customs_brokerage/ last visited August 20, 2015).

21. Mr. Rebollo relied on these assurances and other material representations that K+N was fully capable of successfully importing all manner of products into the United States.

22. As a result, on or about June 26, 2013, Mr. Rebollo, on behalf of Food Club, executed a Power of Attorney in favor of K+N authorizing K+N, among other obligations, to:

- "Make endorse, sign, declare or swear to any customs entry, withdrawal, declaration, certificate, bill of landing, carnet or any other documents required by law or regulation in connection with the importation, exportation, transportation in or through the customs territory [the United States], shipped or consigned or to said grantor."

- "Perform any act or condition which may be required by law or regulation in connection with such merchandise deliverable to said grantor; to receive any merchandise."

- "Sign and swear to any document and to perform any act that may be necessary or required by law or regulation in connection with the entering, clearing, lading, unlading, or operation of any vessel or other means of conveyance owned or operated by said grantor."

- "[G]enerally to transact Customs business, including filing of claims or protests under section 514 of the Tariff Act of 1930, or pursuant to other laws of territories, in which said grantor is or may be concerned or interested and which may properly be transacted or performed by an agent and attorney."

- Appointing K+N as Forwarding Agent "to act as authorized agent for export control, United States Customs, and Census Bureau purposes to transmit such export information electronically that may be required by law or regulations in connection with the exportation and transportation of any goods on behalf of the said USPPI."

23. Mr. Rebollo's company initially enjoyed great success; between on or about August 21, 2013 and on or about December 19, 2014, six (6) shipments of ham product were made from Spain to California. All of those shipments were managed from end-to-end by K+N, including air cargo transportation from Madrid, Spain to the San Francisco airport, where the product cleared U.S. Customs and was transported to Food Club's warehouse facility in San Jose, California. As it had contracted, K+N was solely responsible for the preparation of all necessary export/import

5

paperwork, legal processes, customs clearances, and all other conditions required by law to export the product from Spain, transport it to the United States, and import the product lawfully into the United States.

24. Prior to on or about January 12, 2015, Mr. Rebollo never received any notification from K+N that there were any issues or problems in connection with the shipments and, to the best of Mr. Rebollo's knowledge at that time, K+N had satisfactorily handled those end-to-end shipments in compliance with all applicable laws.

25. The first indication of any issue with the shipments occurred on or about January 8, 2015, when Sabrina King ("Ms. King"), Enforcement Investigations & Analysis Officer for the United States Department of Agriculture ("USDA") Food Safety and Inspection Service ("FSIS") requested from Maritza Cleary ("Ms. Cleary") of K+N, the entry packet and certificates for the most recent shipment.  After Ms. Cleary provided to Ms. King the entry packet for that shipment, Ms. King notified Ms. Cleary that the packet was incomplete and did not include the FSIS Form 9540-1.  Ms. King also twice warned K+N that "it [is] the responsibility of the Broker to be able to provide a copy of all required documents upon request."

26. On or about January 12, 2015, agents from FSIS visited Mr. Rebollo at his home in California, and performed an inspection of product stored at Food Club's warehouse in San Jose, California, which comprised product from six (6) recent shipments.

27. FSIS inspector Manuel Goulart inspected approximately four-hundred and ninety-two (492) pounds of Jamon De Bellota contained in twenty-nine (29) shipping containers, including twenty-five (25) cases of whole hams and four (4) cases of sliced ham .

28. The FSIS inspector found that the product from the six most recent shipments lacked required import stamps that would show that the product was re-inspected by FSIS upon entry to

the United States as part of the importation and customs clearance process. As a result, on or about January 12, 2015 the FSIS/USDA/The Office of Investigation, Enforcement and Audit/The Compliance and Investigations Division issued a Notice of Detention for four-hundred and seventy-four (474) packages of sliced Ham and fifteen (15) whole hams.

29. On or about February 12, 2015, fifteen (15) whole hams and six-hundred and thirty-seven (637) packages of sliced ham, totaling three-hundred and forty-one (341) pounds of valuable product were destroyed by Darling International in the presence of an FSIS investigator after being designated (by FSIS) a "high health risk," *i.e.*, that consuming the product constituted a health hazard capable of causing "serious, adverse health consequences or death."

30. The seizure and destruction of this otherwise perfectly good product was due solely to K+N's failure to procure the necessary FSIS re-inspections on six separate shipments that K+N was entrusted to handle.

31. The product cannot clear through customs until FSIS reinspects.  This is a conditional release by customs which requires the product to move to USDA FSIS for inspection before a final release.  K+N did not facilitate this process as contractually obligated to do so pursuant to the United States Customs and Border Protection, Title 19 of the Code of Federal Regulations § 113.62, Basic Importation and Entry Bond Conditions:

> (c) Agreement to Produce Documents and Evidence.  If merchandise is released conditionally to the principal before all required documents or other evidence is produced, the principal agrees to furnish customs with any document or evidence as required by law or regulation, and within the time specified by law or regulations.

32. On or about January 15, 2015, an investigator from FSIS made a second visit to Mr. Rebollo's home, this time in a quiet gated community within Key Biscayne, Florida, where Mr. Rebollo and his wife and children had recently relocated.  The inspector presented a government badge to gain entry into the small private community and notified security that she was

investigating Mr. Rebollo; the investigator also parked her marked government vehicle outside of Mr. Rebollo's home, prompting suspicion, concern and speculation among his new neighbors.

33. Mr. Rebollo was questioned for nearly five (5) hours and voluntarily gave a statement to the inspector.  This incident was deeply traumatic for Mr. Rebollo, not only because of the disruption to his business and business reputation, but also due to the stain this event created on his and his family's reputation within his new community.

34. On or about January 16, 2015, as a direct result of K+N's failure to present any of its last six (6) shipments at the San Francisco, California airport for FSIS re-inspection, Food Club was forced to issue a recall of over 3,200 pounds of product it had previously distributed and sold.  In connection with the recall, FSIS issued a Class I Recall Release which gave the public notice of the recall.  The notice included the Class I Recall classification: "This is a health hazard situation where there is a reasonable probability that the use of the product will cause serious, adverse health consequences or death."

35. Food Club was also required to send a letter attaching the Releaseto all customers who had ever made a purchase from Food Club, most of whom had already consumed the product.

36. Not surprisingly, the FSIS Recall Release, the ensuing media attention, and the letter to customers resulted in a dramatic loss of customers, the issuance of numerous refunds, cancellation of customer orders and subscriptions, and generally widespread distrust of Food Club and the product itself.

37. Each of the Customs and Border Protection Entry Packets, prepared and signed by K+N, clearly listed the product as "HAM, AND CUTS THEREOF."  Further, the documents displayed the Harmonized Tariff code (HTS Code) 0210.11.0010.  The USDA uses this HTS Code for meat products.  The use of this HTS Code plainly notified K+N, which claims a reputation as a global

transport and logistics company specializing in all aspects of the customs and importation process and fresh product delivery[1], that the product should have been presented to the FSIS (USDA) for inspection during customs clearance.

38. As a direct and proximate result of K+N's reckless and grossly negligent conduct, Mr. Rebollo's company has sales and valuable inventory, and has been forced to pay the costs for the destruction of that inventory.  Many of its customers canceled their orders and subscriptions and Food Club has made refunds to customers and incurred costs to assist customers in destroying the product pursuant to the recalls.

39. The reputation of this one-product company, Food Club, has been severely damaged.  Two years of advertising, marketing and business development of the new company have been essentially rendered worthless due to the negative publicity caused by K+N's failures and the resulting recall.

40. In addition, Food Club has been required to hire several legal specialists as well as an industry expert to deal with different regulatory agencies, consumers and K+N itself.  Further, Food Club has incurred tremendous and ongoing costs to comply with FSIS and USDA requests due to K+N's failure, and Mr. Rebollo's attentions have been diverted from growing his business to stemming the adverse results of this debacle.

41. Food Club still faces a possible penalty from United States Customs and Border Protection for up to $272,868.00 USD, a percentage of the value of product imported.

---

[1] For example, KNFreshChain, a subsidiary of K+N, holds itself out as specializing in the specific requirements of temperature sensitive cargo.  See http://www.kn-portal.com/airfreight/airfreight_products/kn_fresh_chain/ last visited August 20, 2015).  K+N therefore knew or should have known the proper regulatory and legal processes required to import this product.  The re-inspection requirement for meat products is not obscure.  There are resources available in print and online posted on the USDA and FSIS website, including help lines and regulations/code, that would inform as to these requirements.  Mr. Rebollo was entitled to (and did) rely on K+N's expertise in the import processes.

## COUNT ONE:
## <u>BREACH OF CONTRACT</u>

42. Plaintiffs repeat and realleges the allegations of the First through Forty-One Counts of this Complaint as if set forth more fully herein.

43. Plaintiffs and Defendant entered into a valid and binding Customs Power of Attorney.

44. Defendant has materially breached the Customs Power of Attorney by, among other things: (1) failing to provide the complete entry packet and certificates when requested by USDA FSIS; and (2) failure to procure proper United States re-inspection of the product as part of the importation and Customs clearance process.

45. As a result of Defendant's material breach of the Customs Power of Attorney, Plaintiffs have been damaged, which damages are the natural and proximate consequence of Defendant's breach of the Customs Power of Attorney, in an amount to be determined at trial.

## COUNT TWO:
## <u>NEGLIGENCE</u>

46. Plaintiffs repeat and realleges the allegations of the First through Forty-Five Counts of this Complaint as if set forth fully herein.

47. Plaintiffs and Defendant entered into a valid and binding Customs Power of Attorney.

48. Under the Customs Power of Attorney, Defendant undertook the duty to: (1) "[p]erform any act or condition which may be required by law or regulation in connection with such merchandise deliverable to said grantor; to receive merchandise"; (2) [s]ign and swear to any document and to perform any act that may be necessary or required by law or regulation in connection with the entering, clearing, lading, unlading, or operation of any vessel or other means of conveyance owned or operated by said grantor"; and (3) "generally transact Customs business[.]"

49. Defendant has breached that duty by, among other things: (1) failing to provide the complete entry packet and certificates when requested by USDA FSIS; and (2) failure to procure proper United States re-inspection of the product as part of the importation and Customs clearance process.

50. As a direct and proximate result of Defendant's breach, Plaintiffs have lost sales and inventory, paid the costs of destruction of the inventory, had customers cancel their orders and subscriptions, made refunds to customers, has incurred costs to assist customers in destroying the product pursuant to the Class I recall, and has abruptly and immediately halted all imports, sales and further marketing activity.

51. As a result of Defendant's negligence, Plaintiffs have been damaged, which damages are the natural and proximate consequence of Defendant's breach of the duty owed to Plaintiffs, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgement in Plaintiffs' favor and against Defendant as follows:

a.  Compensatory damages in the amount to be determined by a jury;

b.  Punitive damages in an amount to be determined by a jury;

c.  Costs and interest and attorney's fees;

d.  Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  This 2nd day of September, 2015
        Moonachie, New Jersey

                                        FLEMING RUVOLDT PLLC

                                By:

                                        Harold J. Ruvoldt, Esq.
                                        Attorneys for Plaintiffs
                                        1700 Broadway, 28th Floor
                                        New York, New York 10019
                                        (212) 706-1850
                                        hruvoldt@flemingruvoldt.com


Dated:  This 2nd day of September, 2015
        Moonachie, New Jersey

                                        FLEMING RUVOLDT PLLC

                                By:  _____

                                        Harold J. Ruvoldt, Esq.
                                        Attorneys for Plaintiffs
                                        1700 Broadway, 28th Floor
                                        New York, New York 10019
                                        (212) 706-1850
                                        hruvoldt@flemingruvoldt.com